**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KEVIN DANIEL SAUCEDA BEJARNO,

*Petitioner*,

v.

ANDREA DAYANA MONTOYA JIMENEZ,

*Respondent*.

Civil Action No. 19-17524

**OPINION**

**John Michael Vazquez, U.S.D.J.**

      This matter comes before the Court by way of Petitioner's application to return his seven-year-old son, L.S., from New Jersey to his native country of Honduras pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* Petitioner contends that Respondent – L.S.'s mother – wrongfully removed L.S. from Honduras to the United States. Respondent posits that Petitioner has not met his burden of demonstrating wrongful removal, or, alternatively, that she satisfies the Convention's affirmative defenses. For the following reasons, Petitioner's application is **DENIED**.[1]

---

[1] The Court thanks all counsel involved, who provided excellent and vigorous representation on a *pro bono* basis.

## I.     FACTUAL BACKGROUND[2]

L.S. was born in Honduras on May 30, 2013.  D.E. 43, Stipulated Facts ¶¶ 3, 6.  Petitioner Kevin Daniel Sauceda Bejarno ("Petitioner") and Andrea Dayana Montoya Jimenez ("Respondent") are the biological parents of L.S.  *Id.*  Petitioner and Respondent have never been legally married, but they have lived together.  D.E. 1, Compl. ¶ 12; Evid. Tr. Vol. 2 at 159:1-5.[3] According to Petitioner, at the time L.S. was born, Petitioner and Respondent lived together in Las Lajas, Honduras with Respondent's parents for approximately three months.  Evid. Tr. Vol. 1 at 19:6-14.[4]  Respondent testified, however, that Petitioner did not live with her but would rather "come and go."  Evid. Tr. Vol. 2 at 159:12-17.

Thereafter, Petitioner testified that he, Respondent, and L.S. moved to Tegucigalpa to live with Petitioner's then-boss, Lombardo Fausto Jarrin Chavez ("Mr. Giurelli").[5]  Evid. Tr. Vol. 1 at 19:21-20:2.  Petitioner testified that he worked as Mr. Giurelli's driver, and that he, Respondent, and L.S. lived together with Mr. Giurelli for approximately four years.  *Id.* at 20:8-9.  Respondent testified that Mr. Giurelli abused her during this time.  Evid. Tr. Vol. 2 at 128:13-16.  In 2017, Petitioner, Respondent, and L.S. moved back to Las Lajas.  Evid. Tr. Vol. 1 at 22:21-25.  Petitioner worked as a heavy machine operator, typically having to travel for approximately four weeks at a time; he would thereafter return home for several days until he was required to travel again.  *Id.* at

---

[2] The facts are derived from the parties' joint stipulation of facts, the exhibits attached to the parties' submissions, and the parties' testimony presented during the evidentiary hearings on March 10, 2020 and June 30, 2020.

[3] "Evid. Tr. Vol. 2" refers to the proceedings held before the Court on June 30, 2020.

[4] "Evid. Tr. Vol. 1" refers to the proceedings held before the Court on March 10, 2020.

[5] The Court notes that Petitioner's counsel refers to Petitioner's then-boss as "Mr. Giurelli."  *See* Evid. Tr. Vol. 1 at 20:3-4.  Respondent likewise refers to Petitioner's then-boss as "Fausto Giurelli."  *See* Evid. Tr. Vol. 2 at 128:13-14.  The Court therefore does the same.

47:8-25.  Petitioner testified that of the 10,000 lempiras[6] he made a month, he gave Respondent 8,000 as financial support for her and L.S.  *Id*. at 51:12-13; 63:19-24.  Respondent, however, testified that Petitioner provided her with only 2,000 lempiras once every three months.  Evid. Tr. Vol. 2 at 200:1-3.  Over the course of their relationship, Respondent alleged that Petitioner abused her on multiple occasions.  Respondent also claimed that Petitioner is affiliated with a gang. Petitioner denied these allegations.

L.S. began school in Honduras in February 2018[7] and attended school for approximately two months.  Stipulated Facts ¶ 13.  Thereafter, on April 24, 2018, Respondent left Honduras with L.S. and began traveling to the United States.  *Id*. ¶ 15.  L.S. was four years old at the time.  *Id*. ¶ 16.  Once Respondent and L.S. arrived in the United States, they were taken into custody by U.S. Immigration and Customs Enforcement (ICE).  *Id*. ¶ 19.  Respondent and L.S. were processed and detained in an ICE holding facility, and were then transferred to a temporary detention facility in Texas for ten days.  *Id*. ¶¶ 20-21.  Upon their release, Respondent and L.S. traveled to Newark, New Jersey.  *Id*. ¶ 24.  Respondent testified that after arriving in New Jersey, she and L.S. stayed with one of her friends for three days.  Evid. Tr. Vol. 2 at 136:4-13.  Thereafter, she and L.S. stayed with her uncle in Morristown, New Jersey.  *Id*. at 143:9-13.   Respondent further testified that many of her relatives on her father's side also reside in Morristown.  *Id*. at 143:14-16.

While in Morristown, Respondent began a romantic relationship with Alexander Cardona, whom she later married.  *Id*. at 144:6-9; 186:17-20.  Respondent thereafter moved to Parlin, New Jersey in January 2019, where she has resided with L.S. for the past year and a half.  *Id*. at 123:5-

---

[6] The lempira is the official currency of Honduras.

[7] Both Petitioner and Respondent testified that the Honduran school year begins in February.  *See, e.g*., Evid. Tr. Vol. 2 at 131:23-24.

6; 144:10-14.  Respondent currently lives with her husband, L.S., L.S's younger half-brother A.C.,[8] and her seventeen-year-old sister.  *Id.* at 123:9-1; 150:10-14.

Since arriving in the United States, Respondent has permitted L.S. to communicate with Petitioner.  Stipulated Facts ¶ 28.  Respondent has never denied Petitioner access to speak with L.S.  *Id.* ¶ 29.  Respondent testified that Petitioner used to speak with L.S. relatively frequently after Respondent and L.S. arrived in the United States, but that Petitioner has since reduced his communication with L.S.  Evid. Tr. Vol. 2 at 144:15-145:7.  Petitioner testified that he has not spoken as much with L.S. because, according to Petitioner, "[L.S.] seem[ed] to be feeling more withdrawn from [Petitioner]."  Evid. Tr. Vol. 1 at 36:2-6.  Respondent further testified that Petitioner has spoken with L.S. only three times in the year 2020, the last instance of which occurred on June 27, 2020.  *Id.* at 145:3-10.

L.S. has been enrolled in school in the United States since September 2018.  Stipulated Facts ¶ 14.  L.S. attended the first half of kindergarten in Morristown.  *Id.*  Since moving to Parlin in January 2019, L.S. has attended the Sayreville Public School System for kindergarten and first grade.  *Id.*  Respondent testified that L.S. did not speak English when they first arrived in the United States, but that he has progressed substantially since attending school.  Evid. Tr. Vol. 2 at 146:16-25.  Respondent further testified that L.S.'s current hobbies include spending time with his half-brother, riding his bicycle, going to the park and beach, and taking karate classes.  *Id.* at 148:9-15.  Prior to the current COVID-19 pandemic, L.S. also attended church three times a week with Respondent.  *Id.* at 149:1-10.  Respondent also testified that L.S. and her husband have grown very close.  *Id.* at 150:4-9.

---

[8] Respondent testified that she and Mr. Cardona met in June 2018 and married eight months later. She and Mr. Cardona then had A.C., who was born on August 1, 2019.  *See* Evid. Tr. Vol. 2 at 186:17-23.  Respondent testified that L.S. is "very close" with A.C.  *Id.* at 150:4-9.

## II.    PROCEDURAL HISTORY

On June 29, 2018, Petitioner filed an International Restitution Request with the Central Authority of the Republic of Honduras, which was forwarded through the Central Authority of the United States under the Convention.  D.E. 1, Compl. ¶ 7; *see also* D.E. 1-2, Ex. B.  On August 30, 2019, Petitioner filed the instant petition seeking the return of L.S to Honduras pursuant to the Convention.[9]  D.E. 1.  On October 25, 2019, the Court ordered that *pro bono* counsel be appointed to represent Respondent.  D.E. 13, 14.

On December 23, 2019, the Court issued an order requiring Respondent to show cause in writing demonstrating why L.S. had been removed from his habitual place of residence, Honduras. D.E. 16.  The Court thereafter held a telephone conference with the parties, D.E. 20, and scheduled an evidentiary hearing for February 24, 2020.  D.E. 21.  Pursuant to the parties' consent, the Court first permitted expedited discovery.   D.E. 26.   Respondent filed her verified answer with affirmative defenses on January 21, 2020.  D.E. 25.  On February 11, 2020, the Court granted Respondent's request to adjourn the evidentiary hearing and rescheduled the hearing for March 10, 2020.  D.E. 34.  On March 10, 2020, the Court held the first day of hearings.  D.E. 46.  Due to the COVID-19 pandemic, however, the second day of hearings was adjourned.  D.E. 54.  The Court thereafter held several telephone conferences with the parties to determine a suitable date

---

[9] The Court notes that the Convention requires courts to act "expeditiously in proceedings for the return of children" and encourages resolution within six weeks.  The Hague Convention on the Civil Aspects of International Child Abduction Art. 11, October 25, 1980, 19 I.L.M. 1501, 1502. While the Court is aware of the need to conduct such hearings expeditiously, this matter was delayed so that the Court could appoint counsel to represent Respondent and provide time for the parties to take discovery.  Moreover, the Court was forced to adjourn the second day of hearings due to the COVID-19 pandemic, and then wait until the parties acquired adequate technology to conduct the remainder of proceedings by way of video conference.

for continuation of the hearings.  D.E. 55, 58.  The Court then held the second day of hearings by way of video conference on June 30, 2020.  D.E. 62.

### III.    LEGAL STANDARD

The Hague Convention "reflects a universal concern about the harm done to children by parental kidnapping and a strong desire among the Contracting States to implement an effective deterrent to such behavior."  *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995).  To that end, it has two primary purposes: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  The Hague Convention on the Civil Aspects of International Child Abduction Art. 1, October 25, 1980, 19 I.L.M. 1501, 1501.  Importantly, "[t]he Convention is not designed to settle international custody disputes, but rather to ensure that cases are heard in the proper court."  *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005) (citing Hague Convention, art. 19).  "[T]he Convention's procedures are designed to restore the *status quo* prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases."  *Id.*  In other words, "the cornerstone of the Convention is the mandated return of the child to his or her circumstances prior to the abduction if one parent's removal of the child from or retention in a Contracting State has violated the custody rights of the other, and is, therefore, 'wrongful.'"  *Feder*, 63 F.3d at 221 (citing Hague Convention, art. 12).

"The Hague Convention has been ratified by the United States and is implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq. (formerly at 42 U.S.C. § 11601 et seq.)."  *Didon v. Castillo*, 838 F.3d 313, 316 n.1 (3d Cir. 2016).  Honduras is also a signatory.  *Nunez Bardales v. Lamothe*, 423 F. Supp. 3d 459, 464 (M.D. Tenn. 2019).  The

Convention requires all signatories to "designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities."  Hague Convention, art. 6.  Central Authorities must "co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of the Convention."  *Id.*, art. 7.  In the United States, the Department of State is designated as the Central Authority.  *Lutman v. Lutman*, No. 10-1504, 2010 WL 3398985, at \*2 (M.D. Pa. Aug. 26, 2010).

To obtain a court order for a child's return, "the petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful under article 3" of the Convention.  *Baxter*, 423 F.3d at 367.  "A petitioner cannot claim that the removal or retention of a child is 'wrongful' under the Hague Convention unless 'the child to whom the petition relates is "habitually resident" in a State signatory to the Convention and has been removed to or retained in a different State.'"  *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (quoting *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005)).  That analysis typically raises the following four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Id.*  The Convention does not apply to children who are sixteen or older.  Hague Convention, art. 4.  Here, L.S. is currently seven years old.

If "a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence."  *Karkkainen*, 445 F.3d at 288.  All defenses against removal are construed narrowly.

*Feder*, 63 F.3d at 226.  The affirmative defenses under the Hague Convention are as follows:  (1) returning the child to his or her habitual residence would place the child in grave risk of physical or psychological harm, (2) the child's human rights and fundamental freedoms would be threatened if returned, (3) the petitioning parent consented or acquiesced to the removal or retention, (4) the petitioner was not actually exercising custody rights at the time of the alleged wrongful removal or retention, (5) the child is well-settled in his or her new environment and the petition to return the child was filed one year or more after the alleged wrongful removal or retention, and (6) a child who "has attained an age and degree of maturity" expresses a desire to remain in the new country.  Hague Convention, arts. 12-13, 20; *see also* James L. Buchwalter, *Causes of Action for Return of Child Under International Child Abduction Remedies Act*, §§ 8-14 (2016).

In *Feder*, the Third Circuit set forth the steps that a court must take in analyzing a Hague Convention case.  The threshold question is which country was the child's habitual residence immediately before the alleged wrongful removal or retention.  *Feder*, 63 F.3d at 222-23 (citing *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993) and *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)).  The Hague Convention "does not provide a definition for habitual residence," but the term has been defined through case law.  *Id.*  "[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  *Id.* at 224.  Additionally, "a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there."  *Id.*  A change in habitual residence may only take place

"by a change in geography . . . and the passage of time." *Id.* at 222 (quoting *Friedrich*, 983 F.2d at 1401-02). "The inquiry into a child's habitual residence is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004).

In *Baxter*, the Third Circuit analyzed the elements required to establish a *prima facie* case of whether a parent was exercising custodial rights and also reviewed several of the affirmative defenses available under the Hague Convention. There, a father, mother, and their five-year-old son lived an unsettled lifestyle moving from location to location in Australia, and for a one-year period, in Ireland. *Baxter*, 423 F.3d at 365. The family's last home together was on an Australian island "beset with problems," where both parents decided that the environment was unsuitable for their son and that the mother and son should move to the United States to live with his aunt and grandmother. *Id.* at 365-66. The father remained in Australia. *Id.* at 366. The parents were unsure where they would live next, but the father believed that the family would probably return to Australia. *Id.* Shortly after arriving in the United States, the mother fell in love with another man and told the father that she wanted a divorce. *Id.* at 365. The father then filed a petition to return his son to Australia. One of the mother's arguments against removal to Australia was that the father was not exercising his custodial rights. *Id.* at 369.

In rejecting the mother's argument, the Third Circuit stated that "the test for finding the non-exercise of custody rights under the Hague Convention is stringent." *Id.* at 370 (citing *Friedrich*, 78 F.3d at 1065-66). The court in *Baxter* explained that absent a ruling from the child's country of habitual residence (which the court determined was Australia), the court will liberally find "exercise" of rights in favor of the petitioning parent. *Id.* The *Baxter* court noted this finding

could be overcome only when a parent's actions constitute clear and unequivocal abandonment of the child.  *Id.*

Another issue arising in Hague Convention cases is the weight, if any, a court should give to a respondent and/or child's illegal immigration status.  The Third Circuit has not squarely addressed this issue.  According to the Ninth Circuit, illegal immigration status is "relevant only if there is an immediate, concrete threat of deportation" and can be a substantial factor in such scenarios.  *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009).  If there is not an imminent threat of deportation, it appears that immigration status may be considered a factor in regard to whether the child is "well-settled."  *In re Koc*, 181 F. Supp. 2d 136, 154-55 (E.D.N.Y. 2001); *see also Castellanos Monzon v. De La Roca*, No. 16-0058, 2016 WL 1337261, at *14 (D.N.J. Apr. 5, 2016), *aff'd sub nom. Monzon v. De La Roca*, 910 F.3d 92 (3d Cir. 2018).  However, in such cases, immigration status is not given substantial or determinative weight.  *See Castellanos Monzon*, 2016 WL 1337261, at *14.

## IV.    ANALYSIS

### A.  Petitioner's *Prima Facie* Case of Wrongful Removal

As a threshold matter, the Court must first determine whether Petitioner has met his burden of proving a *prima facie* case of wrongful removal.  *Baxter*, 423 F.3d at 367-68.  "Under the Hague Convention, the petitioner bears the initial burden of proving by preponderance of the evidence that the child was habitually resident in a State signatory to the Convention and was wrongfully removed to a different State as defined by Article 3."  *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) (citing *Karkkainen*, 445 F.3d at 287).  "[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective."  *Id.*  The Third Circuit has

10

"divided the analysis of the petitioner's burden into four parts," requiring a court to determine the following:

> (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention.

*Karpenko*, 619 F.3d at 263 (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270-71 (3d Cir. 2007)).

Here, Petitioner has established a *prima facie* case of wrongful removal. First, the parties stipulated that the removal of L.S. from Honduras occurred on April 24, 2018. Stipulated Facts ¶ 15. Second, the Court finds that Honduras was L.S.'s habitual residence immediately prior to his removal. L.S. was born in Honduras, had been physically present in Honduras from birth until he was removed at the age of nearly five,[10] and had never left Honduras prior to his removal. *Id.* ¶ 8. Put simply, Honduras "is the place where [L.S.] ha[d] been physically present for an amount of time sufficient for acclimatization and which ha[d] a degree of settled purpose from [L.S.'s] perspective." *Karpenko*, 619 F.3d at 263; *see also Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020) ("Common sense suggests that some cases will be straightforward: Where a child has lived in one place with [his] family indefinitely, that place is likely to be [his] habitual residence.").

Third, the Court finds that Respondent's removal of L.S. was in violation of Petitioner's custody rights under Honduran law. "To make a custody determination, it is necessary to carefully examine 'the country of origin's custody laws to determine whether the party seeking the child's

---

[10] As noted, L.S. was born in Honduras on May 30, 2013. Stipulated Facts ¶ 3. Respondent removed L.S. from Honduras on April 24, 2018. *Id.* ¶ 15.

return had custody rights in that country . . . at the time the child was removed." *Tsai-Yi Yang*, 499 F.3d at 275 (quoting *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006)).  Pursuant to Honduran law, the exercise of parental authority belongs to both parents jointly. *See* Hond. Family Code, Tittle V of Custody, Article 185 *et seq.*; *see also* D.E. 41, Ex. H.  Absent a parental agreement on custody, a disagreement between spouses regarding the exercise of parental authority must be decided by a court of competent jurisdiction.  *Id*.  Here, Respondent testified that she added Petitioner to L.S.'s birth certificate as L.S.'s biological father. Evid. Tr. Vol. 2 at 126:4-6. Respondent also conceded that she never petitioned a Honduran court to divest Petitioner of his custody rights.  *Id*. at 197:17-19.  Accordingly, the Court finds that Respondent's removal of L.S. breached Petitioner's custody rights under Honduran law.

Fourth, the Court finds that Petitioner was exercising his custody rights at the time of the wrongful removal.  With respect to this final prong, a petitioner's "burden is easy because 'the test for finding the non-exercise of custody rights under the Hague Convention is stringent.'"  *Tsai-Yi Yang*, 499 F.3d at 277 (quoting *Baxter,* 423 F.3d at 370); *see also In re Application of Adan*, 437 F.3d at 391 ("Once it is determined that a [petitioner] had valid custody rights under the country of origin's laws, [v]ery little is required of the [petitioner] in support of the allegation that custody rights have actually been or would have been exercised.  The [petitioner] need only provide some preliminary evidence that he or she actually exercised custody of the child[.]") (internal quotations omitted)).  In short, "nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Tsai-Yi Yang*, 499 F.3d at 277 (citing *Baxter,* 423 F.3d at 370).  While the parties dispute the *extent* to which Petitioner was exercising his custody rights, the critical facts demonstrate that Petitioner *was* exercising his custody rights at the time of the removal.  Petitioner supported L.S. both emotionally and financially, and lived

with L.S. when he returned from traveling for work.  It is undisputed that Petitioner was a part of L.S.'s life, at least to some degree, from the time that L.S. was born (or shortly thereafter – as the parties dispute whether Petitioner was present for the birth and on the original birth certificate) until the time that L.S. was removed from Honduras.  Accordingly, the Court finds that Petitioner was exercising his custody rights at the time of L.S.'s removal.

In sum, the Court finds that Petitioner has satisfied his initial burden of proving a *prima facie* case of wrongful removal.

### B.  Respondent's "Well-Settled" Defense

"Once the petitioner meets its initial burden, the respondent may oppose the child's return by proving one of [the] affirmative defenses[.]"[11]  *See Castellanos Monzon*, 2016 WL 1337261, at *9 (quoting *Karpenko*, 619 F.3d at 263); *see also Monzon v. De La Roca*, 910 F.3d 92, 100 (3d Cir. 2018) ("The petitioner has the initial burden of proving by a preponderance of the evidence that the child was wrongfully removed, whereupon 'the respondent may oppose the child's return' by establishing the 'affirmative defenses' or 'exceptions' as listed under ICARA provision 22

---

[11] While Respondent contends that the affirmative defenses of "grave risk" and "consent" are also applicable in this case, the Court does not analyze those defenses because, as discussed more fully below, the Court finds that Respondent has carried her burden as to the "well-settled" defense. *See Monzon*, 910 F.3d at 104 ("We have consistently allowed prevailing parties to demonstrate only one affirmative defense to petitions under the Convention.").  The Court does note, however, that these issues were hotly contested by the parties.  As to the "consent" defense, Respondent claimed that Petitioner consented to Respondent and L.S. coming to the United States after having discussed it extensively, Evid. Tr. Vol. 2 at 133:1-3, and that Petitioner gave her a cellphone and money so that they would be able to communicate after Respondent and L.S. arrived in the United States, *id*. at 134:2-5.  Petitioner denied these claims, testifying that Respondent raised the possibility of traveling to the United States only one time – Petitioner being strongly against it – and that he never provided Respondent with a cellphone or money to travel.  Evid. Tr. Vol. 1 at 29:10-30:15.  As to the "grave risk" defense, Respondent claimed that Petitioner was a gang member whose affiliations endangered Respondent and L.S.  Evid. Tr. Vol. 2 at 155:1-9.  Again, Petitioner emphatically denied these claims.  The Court also heard from Dr. Donald Franklin, a licensed psychologist, whose testimony was focused on the risk of psychological harm to L.S. should he be returned to Honduras.  Evid. Tr. Vol. 1 at 84:15-17.

U.S.C. § 9003(e)(2)(A) and (B).").  Relevant here, the Court "may refrain from ordering the return of a wrongfully-removed child if the Respondent establishes, by a preponderance of the evidence . . . that the proceeding was commenced more than one year after the removal of the [child] and the [child] ha[s] become 'well-settled' in [his] new environment." *Castellanos Monzon*, 2016 WL 1337261, at *9 (quoting *Delgado v. Osuna*, No. 15-00360, 2015 WL 5095231, at *5 (E.D. Tex. Aug. 28, 2015), *aff'd*, 837 F.3d 571 (5th Cir. 2016)).

Importantly, "[w]here a court determines a child has been wrongfully removed, Article 12 of the Convention provides that the child is to be returned 'forthwith,' *as long as* the proceedings have been 'commenced' in the 'judicial or administrative authority of the Contracting State where the child is' *less than one year before the date of wrongful removal*." *Monzon*, 910 F.3d at 96 (second emphasis added).  To this point, "ICARA defines 'commencement of proceedings' as used in Article 12 of the Convention as 'the filing of a petition in accordance with [22 U.S.C. § 9003(b)].'" *Id.* at 98.  In turn, § 9003(b) states as follows:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by *filing a petition* for the relief sought in *any court which has jurisdiction of such action* and *which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed*.

22 U.S.C. § 9003(b) (emphases added); *see also Monzon*, 910 F.3d at 99 (quoting same).  The proceedings in this case were "commenced" on August 30, 2019 – the date when Petitioner filed his petition in the District of New Jersey.  *See Castellanos Monzon*, 2016 WL 1337261, at *12 ("[T]he date on which the judicial proceedings in this matter were 'commenced' under [ICARA] is when the [p]etition was filed in the jurisdiction where the child was located, which, in this case, is the State of New Jersey."); *see also Monzon*, 910 F.3d at 99 ("If a parent pursues the remedies available for the return of his/her child under ICARA, Congress has clearly required that the parent

do so by filing a petition . . . in [a] court . . . where the child is located.") (internal quotations omitted)).

Here, L.S. was wrongfully removed on April 24, 2018.  Because Petitioner did not file his petition until August 30, 2019 – sixteen months after the removal – the proceedings in this matter were not "commenced" under the Convention within one year of the child's wrongful removal.[12] As such, where "the proceedings are commenced after the expiration of the period of one year, the court must order the return of the child unless it is demonstrated that the child is now settled in its new environment." *Castellanos Monzon*, 2016 WL 1337261, at *11 (internal quotations omitted); *see also Monzon*, 910 F.3d at 99 ("[I]f one year has elapsed since a child was wrongfully removed or retained when a petition is filed, a court must also determine whether the child is settled in its new environment. . . . [T]he now settled exception only applies where the child has been in the destination state for more than one year from the date of the wrongful removal or retention.") (internal quotations omitted)).  Accordingly, because Petitioner filed his petition in this matter

---

[12] The Court is mindful of the fact that, in Petitioner's words, "it took time to retain counsel and file suit in the United States . . . for someone of limited means who speaks no English and resides thousands of miles away from the District of New Jersey."  D.E. 64, Def.'s Summation Br. at 18. The Court is certainly sympathetic to that difficulty. Nonetheless, the Third Circuit has made clear:

> [While] [w]e realize that [petitioner] tried to act diligently, and we are not unsympathetic to his efforts[,] our inquiry into what constitutes a proper filing for these purposes is circumscribed by the language of ICARA and the Convention.  We cannot ignore that language by extending it to include a document filed with either the [Honduran] Central Authority or the U.S. Department of State.  If a parent pursues the remedies available for the return of his/her child under ICARA, Congress has clearly required that the parent do so by "filing a petition . . . in [a] court . . . where the child is located."

*Monzon*, 910 F.3d at 99.

more than one year from the date of the wrongful removal, the Court must determine whether L.S. is now well settled in the United States.[13]

To meet this affirmative defense, Respondent must demonstrate by a preponderance of the evidence that L.S. is now settled in the United States. *See Castellanos Monzon*, 2016 WL 1337261, at *12 ("Under ICARA, Respondent bears the burden of establishing the settled defense by a preponderance of the evidence."); *see also Monzon*, 910 F.3d at 101 ("ICARA requires that a respondent only establish by a preponderance of the evidence that [] the child is now settled in [his] new environment[.]"). The court in *Castellanos Monzon* highlighted the following non-exhaustive factors that a court should typically consider in determining whether the well-settled defense is applicable:

> (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly[14]; (5) the stability of the parent's employment or other means of support; (6) whether the child has friends and relatives in the area; (7) to what extent the child has maintained ties to the country of habitual residence; (8) the level of parental involvement in the child's life; (9) active measures to conceal the child's whereabouts (and the possibility of criminal prosecution related thereto); and, (10) the immigration status of the child and parent.[15]

---

[13] As the Supreme Court has noted, "[r]ather than establishing any certainty about the respective rights of the parties, the expiration of the 1-year period opens the door to consideration of a third party's interests, *i.e.*, the child's interest in settlement." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 15 (2014).

[14] While courts have considered as a factor whether the child attends "church" regularly, the Court construes this inquiry more broadly to also include whether the child "participates in other community or extracurricular school activities." *See Lozano v. Alvarez*, 697 F.3d at 57. In other words, the critical inquiry is whether the child participates in activities that evidence community ties, be it religious or not.

[15] In ultimately affirming the District Court's decision in *Castellanos Monzon*, the Third Circuit approvingly quoted the factors used by the District Court and noted that the District Court had "undert[aken] an exceedingly thorough, careful, and thoughtful analysis of the evidence and

2016 WL 1337261, at *12; *see also Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012) (explaining that the factors courts should consider include "(1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent") (brackets in original), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).  The Court addresses each factor in turn.

As to the first factor, L.S. was a little over six years old at the time Petitioner commenced the instant proceeding. "[C]ourts generally conclude that repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country." *Castellanos Monzon*, 2016 WL 1337261, at *13 (quoting *Taveras v. Morales*, 22 F. Supp. 3d 219, 236 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 55 (2d Cir. 2015)).  Here, L.S. is old enough to form memories and ties to the United States.  Moreover, at the time the petition was filed, L.S. had been in the United States for over fifteen months – more than sufficient time to form such memories and ties.  Accordingly, the Court finds that the first factor weighs in favor of finding that L.S. is settled in the United States.  *See id*. (finding that child's age of five weighed in favor of settlement); *see also In re Lozano,* 809 F. Supp. 2d 197, 232 (S.D.N.Y. 2011) (finding that five-year-old child who had been in United States for sixteen months weighed in favor of settlement), *aff'd*, *Lozano v. Alvarez,* 697 F.3d 41.

---

various factors that pertain to how well a child is settled in a community and home." *Monzon*, 910 F.3d at 105.  As such, the Court likewise uses those factors in this matter.

As to the second factor, while L.S. has resided in a few homes since arriving in New Jersey, L.S. has resided at his current home in Parlin, New Jersey since January 2019.[16]  Evid. Tr. Vol. 2 at 123:5-6; 144:10-14.  Respondent's testimony, which the Court finds credible on this issue, demonstrated that L.S.'s move to Parlin, New Jersey evidenced a transition to a stable residence.  Respondent lives with her husband and A.C. – L.S.'s stepfather and half-brother, respectively – both of whom L.S. has apparently grown very close with.  *Id*. at 150:4-9.  A.C. was born before the petition in this case was filed.  Accordingly, the Court finds that the second factor supports a finding of a stable residence and, at the very least, is neutral in the Court's analysis.

As to the third factor, Respondent testified that L.S. regularly attended school while in New Jersey.  L.S. has been enrolled in school in New Jersey since September 2018,  attending the first half of kindergarten in Morristown.  Stipulated Facts ¶ 14.  Since moving to Parlin in January 2019, L.S. has been enrolled in the Sayreville Public School System for kindergarten and first grade.  *Id*.  Respondent further testified that L.S. has progressed in learning English since attending school.[17]  Evid. Tr. Vol. 2 at 146:16-25.  Before the current petition was filed, L.S. had already finished his first year of school and was just about to start his second.  Accordingly, the Court finds that the third factor weighs in favor of finding that L.S. is settled.  As to the fourth factor, the Court

---

[16] Prior to moving to Parlin, L.S. had lived in Morristown – save for a handful of days in Newark upon first arriving in New Jersey.  It also appears that L.S.'s time in Morristown was stable – he lived with his mother's uncle, Respondent had additional relatives in the area, and L.S. started kindergarten.

[17] To be clear, the Court is not considering evidence occurring after the first day of the hearing as to L.S. being settled.  The second day of testimony was adjourned due to the pandemic and through no fault of Petitioner.  For example, Respondent testified that L.S. is very close with his stepfather.  Respondent also explained that L.S.'s stepfather helped L.S. communicate with Petitioner well before the petition in this matter was filed.  The Court considers this testimony.  However, Respondent added that on Father's Day this year – June 21, 2020 – L.S. made very kind and sentimental remarks to his stepfather.  The Court does not consider this evidence.

heard credible testimony that, prior to quarantine, L.S. attended church three times a week, *id*. at 149:3-4, attended classes at his church, *id*. at 149:5-8, and has friends at his church, *id*. at 149:9-10.  Moreover, Respondent also testified that L.S. takes karate classes.  *Id*. at 148:9-15.  As such, the Court finds that the fourth factor weighs in favor of finding that L.S. is settled.

As to the fifth factor, Respondent testified that she has not applied for a work permit in the United States, but has worked sporadically in a restaurant.[18]  *Id*. at 187:3-10.  As such, the Court finds that the fifth factor weighs against finding that L.S. is settled in the United States.  With respect to the sixth factor, the Court heard ample testimony concerning L.S.'s friends and relatives in the area.  Respondent testified that L.S. has made friends at his school, *id*. at 148:16-17, friends in his neighborhood, *id*. at 148:18-19, and friends at his church, *id*. at 149:9-10.  Furthermore, L.S. lives with his maternal aunt and new half-brother, and has other extended family members who also reside nearby in New Jersey.  Respondent introduced several photographs of L.S. with his family, including family pictures from L.S.'s fifth birthday party, as well as pictures from another family dinner. *See, e.g.*, Ex. R-3e, nos. 37, 45, 49; *see also* Evid. Tr. Vol. 2 at 151:18-152:15. Accordingly, the Court finds that the sixth factor weighs in favor of finding that L.S. is settled.

As to the seventh factor, L.S. was removed from Honduras when he was four years old, at the time having been in school for only two months.  *Id*. at 131:19-24.  While Respondent testified during cross-examination that L.S. did not have friends in Honduras, she was contradicted by her deposition testimony during which she conceded that L.S. did have friends there.  *Id*. at 165:2-8. The Court credits Respondent's deposition testimony and finds that L.S. did have friends in Honduras.  Nonetheless, this finding does not change the Court's analysis.  Respondent further

---

[18] The Court recognizes that Respondent has a child who is under a year old.  While it is unclear whether Respondent's husband has a work permit, presumably Respondent's husband does work and financially supports the family.  However, the record was not developed in this regard.

testified that L.S. was not involved in any extra-curricular activities while in Honduras, *id*. at 131:25-132:2, did not play in parks or playgrounds in Honduras for alleged safety reasons, *id*. at 132:3-7, and since moving to the United States has had at best sporadic communication with Petitioner,[19] who still lives in Honduras. *Id*. at 145:3-7; *see also* Evid. Tr. Vol. 1 at 36:2-3. Critically, however, the Court heard very little testimony concerning what other ties L.S. still maintains with Honduras.  While L.S. does have family in Honduras on both his father and mother's side, the record does not reflect what, if any, contacts L.S. maintains with those family members.  As such, the Court finds that the seventh factor weighs in favor of finding that L.S. is settled in the United States.

With respect to the eighth factor, both Respondent and L.S.'s stepfather appear to have a close relationship with L.S.  Respondent credibly testified that L.S.'s stepfather, with whom L.S. has grown close, enjoys spending time and playing with L.S.  Evid. Tr. Vol. 2 at 150:1-9. Respondent also testified that their family enjoys going to the park and beach.  *Id*. at 148:10-13. Additionally, Respondent obtained a pediatrician for L.S. when they first arrived in the United States and made sure that L.S. received all of his immunizations.  *Id*. at 143:19-22.  *See Castellanos Monzon*, 2016 WL 1337261, at *14 (finding eighth factor in favor of settlement where respondent and new partner enjoyed close relationship with child, and where respondent obtained regular pediatrician for child in United States); *see also Ramirez v. Buyauskas*, No. 11-6411, 2012 WL 606746, at *18 (E.D. Pa. Feb. 24, 2012), *amended*, 2012 WL 699458 (E.D. Pa. Mar. 2, 2012) (finding eighth factor in favor of settlement where "[r]espondent enjoy[ed] a very close

---

[19] Importantly, the Court notes – and the parties stipulated – that since arriving in the United States, Respondent has not only permitted L.S. to communicate with Petitioner, but has "never denied Petitioner access to speaking with L.S."  Stipulated Facts ¶¶ 28-29.

relationship with her children, for whom she is the primary caretaker," and that "[t]he success with which [respondent's] children adapted to the United States reflects well on respondent's ability to parent her children, including . . . getting her children vaccinated once they arrived in this country."). Accordingly, the Court finds that the eighth factor weighs in favor of finding that L.S. is settled.

As to the ninth factor, the parties dispute the extent to which Respondent allegedly concealed the removal of L.S. from Honduras until she and L.S. were already in the United States. Nonetheless, the parties have stipulated that "[s]ince arriving in the United States, Respondent has permitted L.S. to communicate with his father" and that Respondent "has never denied Petitioner access to speaking with L.S." Stipulated Facts ¶¶ 28-29. Accordingly, the Court finds that the ninth factor – whether Respondent took measures to conceal L.S.'s whereabouts – weighs in favor of Respondent.

As to the tenth factor, neither Respondent nor L.S. is a citizen of the United States. Stipulated Facts ¶ 7. Despite Respondent's contention that she and L.S. have sought asylum in the United States, their immigration status remains uncertain. Respondent testified that she routinely checks in with immigration services, Evid. Tr. Vol. 2 at 141:14-15, and has been compliant with all of immigration service's requests since being detained in May 2018. *Id.* at 141:22-24. Respondent also testified that she currently has an immigration proceeding scheduled for November 2021. *Id.* at 141:25-142:2. However, Respondent also testified that she had not yet filed a formal application for asylum. *Id.* at 180:8-11. At the very least, Respondent and L.S's immigration status remains uncertain. Accordingly, the Court finds that the tenth factor weighs against finding that L.S. is settled in the United States.

After careful consideration of the foregoing factors, the Court finds that factors one, two, three, four, six, seven, eight, and nine weigh in favor of finding that L.S. is settled. Conversely, the Court finds that factors five and ten weigh against finding that L.S. is settled.[20]  Importantly, however, "while [a] more comfortable material existence does not mean that the child is well settled, by the same token, the child's life does not have to [be] perfect for [him] to be settled." *Castellanos Monzon*, 2016 WL 1337261, at *12 (internal quotations and citations omitted). In light of the substantial majority of factors weighing in favor of settlement, the Court finds that Respondent has met her burden of establishing by a preponderance of the evidence that L.S. has subsequently become settled in his new environment. *See Monzon*, 910 F.3d at 101 ("ICARA requires that a respondent only establish by a preponderance of the evidence that [] the child is now settled in [his] new environment[.]").  In sum, the factors considered by the Court – and, importantly, the quality of evidence supporting them – leads to such a finding. In other words, the Court weighed the factors not merely by comparing the total number that favors one finding as opposed to another, but the Court also considered the quality of the evidence supporting each factor. Accordingly, Petitioner's application is denied.[21]

Of final note, Petitioner requests that the Court exercise its discretion to order the return of L.S. to Honduras notwithstanding the applicability of any affirmative defense. Def.'s Summation Br. at 17. It is true that "even if the respondent meets his or her burden of proving [an] affirmative

---

[20] As noted, factor two is, at the very least, neutral in the Court's analysis.

[21] The Court emphasizes that its decision is not a custody determination. *See, e.g.*, *Castellanos Monzon*, 2016 WL 1337261, at *15 ("[T]he Court stresses that its decision today is neither a custody determination, nor is it a determination that Petitioner cannot have any contact, whether in person or otherwise, with [the child], or where [the child] should ultimately reside. . . . Instead, the Court's ruling today is merely a determination that, under the principles set forth in the Convention and ICARA, [the child] shall not be ordered returned to Guatemala while any custody determination may be litigated.").

defense, the court retains the discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child." *Tsai-Yi Yang*, 499 F.3d at 278. The Court, however, declines to exercise its discretion in this matter.

## V.  CONCLUSION

For the reasons set forth above, Petitioner's application to return L.S. to Honduras is **DENIED**. An appropriate Order accompanies this Opinion.

Dated: July 21st, 2020

John Michael Vazquez, U.S.D.J.

23